# EXHIBIT B

63

GARY GREENFIELD - 03/14/2016

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

MARKET LOFTS COMMUNITY ASSOCIATION, a California corporation,

       Plaintiff,

vs.

                        No. 2:15-cv-3093-RGK (SPx)

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,PA, a Pennsylvania corporation,

       Defendant.

_____/

VIDEOTAPED DEPOSITION OF GARY GREENFIELD

Taken before Monique Reyes

CSR No. 13927

March 14, 2016

GARY GREENFIELD - 03/14/2016                    Page 2

I N D E X

PAGE

EXAMINATION BY MR. ROSENBERG                    5

E X H I B I T S

PAGE

DEFENDANT'S

Exhibit 1    Mr. Greenfield's report           21

Exhibit 2    Letter dated 12/11/15             61

Exhibit 3    Mr. Greenfield's spreadsheet      73

Exhibit 4    AIG letter dated 10/21/15         74
             with Exhibits A-D

Exhibit 5    Notice of motion and motion for   85
             judgment on the pleadings

DEPOSITION OF GARY GREENFIELD

BE IT REMEMBERED, that pursuant to Notice, and on the 14th day of March 2016, commencing at the hour of 10:05 a.m., in the offices of Aiken Welch Court Reporters, One Kaiser Plaza, Suite 250, Oakland, California 94612, before me, Monique Reyes, a Certified Shorthand Reporter, State of California, personally appeared GARY GREENFIELD, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES

For the Plaintiff:

             JAMES A. LOWE, ESQ.
             GAUNTLETT & ASSOCIATION
             18400 Von Karman. Suite 300
             Irvine, California 92601
             949.553.1010 Ext. 260
             Jal@gauntlettlaw.com

For the Defendant:

             LEE J. ROSENBERG. ESQ.
             BAUTE CROCHETIERE & GILFORD LLP
             777 South Figueroa Street, Suite 4900
             Los Angeles, California 90017
             213.630.5000
             Lrosenberg@bautelaw.com

Also present:   Videographer, Kevin Gogarti

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning.  We are now on   10:05:15
the record.  This begins the deposition of Gary   10:05:16
Greenfield in the matter of Market Lofts versus National   10:05:20
Union Fire Insurance Company, venued in the US District   10:05:26
Court for the Central District of California.  Case   10:05:29
number 2:15-CV-03093-RJ -- or GK.   10:05:32

Today's date is March 14th, 2016, and the time   10:05:43
on the video monitor is 10:05.  The video operator today   10:05:48
is Kevin Gogarti.  And this video deposition is being   10:05:53
taken place at One Kaiser Plaza in Oakland, California.   10:05:57

Would Counsel please voice identify yourselves   10:06:02
and state who you represent.   10:06:02

MR. ROSENBERG:  My name is Lee Rosenberg,   10:06:04
Counsel for National Union Fire Insurance Company of   10:06:07
Pittsburgh, PA, the Defendant.   10:06:08

MR. LOWE:  I'm James Lowe, Gauntlett &   10:06:10
Associates, representing Plaintiff, Market Lofts   10:06:14
Community Association.   10:06:20

THE VIDEOGRAPHER: The court reporter today is   10:06:20
Monique Reyes of Aiken Welch Court Reporters.   10:06:22

And would you please swear in the witness.   10:06:25

GARY GREENFIELD

sworn as a witness

testified as follows:

EXAMINATION BY MR. ROSENBERG:                    10:06:37

Q.  Good morning, Mr. Greenfield.               10:06:37

A.  Good morning.                               10:06:39

Q.  How are you doing today?                    10:06:40

A.  Good.                                       10:06:41

Q.  Good.  Have you been retained as an expert  10:06:42
witness by Market Lofts Community Association?   10:06:44

A.  Yes.                                        10:06:47

Q.  And are you testifying today here in that   10:06:48
capacity?                                        10:06:50

A.  Yes.                                        10:06:50

Q.  And you have been deposed before; that's    10:06:51
correct?                                         10:06:54

A.  Yes.                                        10:06:54

Q.  Are you familiar with the typical admonitions  10:06:54
that lawyers give to deponents, typical rules of  10:06:57
depositions?                                     10:07:02

A.  Yes.                                        10:07:02

Q.  Okay.  There is no need for me to repeat those  10:07:02
today?                                           10:07:06

A.  Not for my sake.                            10:07:06

Q.  That's good.  Okay.                         10:07:07

happened other than that they're just there, the entries?     01:36:53

A.  Right.  Right.  There is no -- we -- we have     01:36:58
not -- we didn't provide a report that identifies those     01:37:02
particular entries.  That's correct.     01:37:07

Q.  Okay.  So when you've gone back to do your     01:37:09
further analysis and further aggregation -- or whatever     01:37:16
term you use, what were you -- what are you looking for     01:37:21
to assess in your review whether or not an entry or group     01:37:25
of entries is related or not to the defense of the     01:37:31
cross-complaint?     01:37:35

A.  I will look at the substance of the entry and if     01:37:36
appears to be -- and so I will look at the entry and     01:37:41
think is this something that would -- that would be     01:37:45
something that if you were defending against the     01:37:49
cross-complaint, is this what you would reasonably do?     01:37:54
And if I have a question about that, I will either ask     01:37:58
counsel about it and it may be something that I don't     01:38:03
know -- that I don't know precisely what was going on.     01:38:09
Or I will ask counsel in the underlying case about it.     01:38:12
Or I will go back as I often do, and look in the -- in     01:38:16
the materials in the file.  Often that answers the     01:38:21
question.  Like that would've answered the question with     01:38:23
regard to the motion on the judgment on the pleadings.     01:38:27

Q.  Okay.  And so that work is not -- is not done     01:38:31
yet?     01:38:35

A.  It's not complete yet.  I've done -- I've done some of it.  And it may be done, but I haven't actually gone through and said, okay, these are all the ones that we can identify.

Q.  Okay.  So this -- so your -- your report, the one that we have right now, it -- this is not your final opinion in this case?

A.  It is my -- it is -- it's my opinion in this case.  But what I'm telling you is that -- and this is a normal process.  As I go through and review time entries and I review them again -- I'm continually reviewing time entries in a case.  If I notice things and I go, you know, actually that time entry -- maybe that really doesn't relate to the defense of the cross-complaint.  I'll find out.  And then we'll withdraw it if it doesn't.  But I don't always know until I've done that additional investigation.

Q.  Okay.

A.  So it is my final opinion in -- in the sense that --  it's my understanding as of the time I wrote the report.  But we are continually always -- and this is true in every case.  Looking at time entries and we may see things that we hadn't noticed before.  Or as I get even more familiar with the case, I may see something that -- that I haven't noticed before.

Q.  Okay.  So your opinion in this case regarding the reasonableness and the relatedness are certainly based on the information you had at the time, but they may not be your final -- they may not be your final opinion?

A.  Not as to that issue.  That's right.

Q.  Okay.

A.  I mean -- my -- my opinion as to the precise entries that make up this universe of entries that are not defense related.  That's what we're trying to do is come up with a precise final universe of entries that are not defense related.

Q.  When you are concluding, generally, that the fees are -- were reasonable, you are -- we're talking -- we're still talking generally plus or minus about the 630,000 over the course of a year that -- that you analyzed?

A.  Yes.

Q.  So when you're saying that these are reasonable and you're basing them on your review of the different pleadings and your conversations and -- and sort of your -- your experience, are you able to reach that conclusion without doing an analysis of the individual projects within that year and what time was spent on those individual projects?

Q.  This is -- this is -- this is my only point.  Is -- is this -- maybe it's not my only point.  But this is just not a final statement or reflection.

A.  Subject to the fact that there are entries that I think were a very small number of entries that we're looking at to see whether they should also be withdrawn in addition to the 8500 to this Complaint.  And subject to getting further in finishing --

Q.  And the 8500.  That would be -- that does not include all the other insurance and administrative tasks that we discussed today, does it?

A.  The 8500 -- okay.  First of all, I -- I believe that even the eighty -- that we -- after the report was done, we went back through and I think that the 8500 maybe a little low.  But let's call it $8500 to $10,000 of time that we've identified that might be not related to the defense of the cross-complaint.  Okay?  The -- but -- but that plus these, you know, small amounts here, that's on Exhibit 4, that's the universe so far that we've identified that ought to be withdrawn.  Is that clear?

Q.  To be super clear, though, the statement you're making here that the fees and expenses being sought for reimbursement are reasonable and appropriate, is that statement not premature?

GARY GREENFIELD - 03/14/2016                Page 133

A.  In the sense that there are -- there are -- are some entries that we are -- that may have additional entries that have to be withdrawn, yes. `02:55:20` `02:55:26` `02:55:32`

Q.  You know, I think we've been going about an hour now.  Why don't we go off the record. `02:55:43` `02:06:16`

THE VIDEOGRAPHER:  We're going off the record at 2:06. `02:06:22` `02:06:22`

(Whereupon a recess was taken.) `02:06:17`

THE VIDEOGRAPHER:  We are back on the record at 2:26. `02:06:24` `02:26:18`

BY MR. ROSENBERG: `02:26:52`

Q.  Mr. Greenfield, we discussed earlier for the most part the homeowner cross-complaint.  At some point I understand that there was a second cross-complaint filed.  We can call it the Market Lofts cross-complaint.  It was filed just against Market Lofts. `02:26:52` `02:26:56` `02:27:03` `02:27:08` `02:27:12`

Do you know what I'm referring to? `02:27:15`

A.  Yes.  Although, I've been talking about the cross-complaint.  I haven't just been talking about the homeowners, the one against the homeowners. `02:27:17` `02:27:22` `02:27:26`

Q.  Fair enough. `02:27:31`

A.  I've been talking about the cross-complaint in general. `02:27:32` `02:27:35`

Q.  Well, you understand that the cross-complaint against the homeowners was dismissed and then at some `02:27:36` `02:27:41`

REPORTER'S CERTIFICATE

I, Monique Reyes, a Shorthand Reporter, State of California, do hereby certify:

That GARY GREENFIELD, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

That before completion of the proceedings, Review of the transcript was requested.

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 22nd day of March 2016.

_____
Monique Reyes, CSR NO. 13927
State of California

## Report of Gary Greenfield

I am providing this Report pursuant to Rule 26 of the Federal Rules of Civil Procedure on behalf of plaintiff Market Lofts Community Association in this action, Market Lofts Community Association v. Fire Insurance Co. of Pennsylvania, No. CV 15-03093-RGK (MANx) (the "action").

This action concerns whether National Union has a duty to defend its insured against cross-complaints against it in Market Lofts Community Association v. 9th Street Market Lofts, LLC, and related cross-action, Superior Court for the County of Los Angeles, No. BC472621 (the "underlying action") and, if there is, whether defendant National Union Fire Insurance Co. of Pennsylvania (the "defendant" or "National Union") has breached its duties toward plaintiff Market Lofts Community Association ("plaintiff" or the "Association") related thereto, and damages owed by National Union to the Association.

I have been retained by plaintiff as an expert witness in this action to testify regarding the reasonableness of the attorneys' fees being sought by plaintiff from defendant.

### Background and Expertise

I am the founder of Litigation Cost Management (LCM), based in Oakland, California. LCM commenced business in 1991. LCM is in the business of consulting regarding legal fee-related issues. As part of our business, we regularly conduct analyses of both legal and expert witness fees in litigation with regard to the reasonableness, appropriateness and allocation of time, fees and expenses being sought, as well as hourly rates. We also consult with clients regarding how to manage there outside litigation more effectively and efficiently. LCM works with both law firms and clients of law firms in undertaking its analyses and consulting about effective litigation management.

Prior to starting LCM in January, 1991, I was a partner in the law firm of Shartsis, Friese & Ginsburg in San Francisco, California, where I was a litigator for fifteen years, having become a partner in the firm in 1981. During my career at my former law firm, I handled general commercial litigation, including the full gamut of litigation from pre-filing preparation and negotiations through trials and appeals. I handled litigation of varying types, including breach of contract, constitutional law, securities, fraud, bankruptcy litigation, intellectual property, unfair competition, and civil rights litigation. I represented both plaintiffs and defendants. I handled both contingency cases and cases where we were compensated on an hourly basis. I graduated from the Boalt Hall School of Law in 1975 and received my undergraduate degree from Stanford University in 1971.

Since LCM was founded, I have conducted several hundred analyses of the legal and expert witness fees and expenses in cases of various types and sizes.

3/2/16 4:26 PM                                         1



These have included individual actions, multi-party suits and class actions. The cases have included the full range of civil litigation, such as patent, copyright, trademark, real property, False Claims Act, ERISA bankruptcy, tax, breach of contract, securities, antitrust, environmental, insurance coverage and bad faith, discrimination, disability, civil rights, constitutional law, inverse condemnation, personal injury and products liability cases. I have myself been personally involved in, conducted analysis in and supervised each of these analyses. As part of my work on these projects, I have prepared and submitted numerous reports on attorneys' fees issues, both on behalf of parties opposing fee applications and on behalf of law firms or clients submitting them.

I have also qualified and testified previously as an expert witness in litigation regarding legal and expert witness fees, both on behalf of parties seeking to recover their attorneys' fees and parties opposing requests for attorneys' fees.

I was appointed a Special Master to analyze and report to the San Francisco Superior Court regarding the fees and expenses of various law firms and experts in an insurance company conservation proceeding before that Court.

As part of my work, I also consult with law firms and clients of law firms regarding law firm billing practices, effective litigation management, and legal bill auditing procedures. I have lectured and conducted seminars for clients and law firms in each of these areas.

I have taught or been a speaker at a number of programs regarding analysis of legal fees, legal bill auditing and litigation management. I have been an instructor for the National Association of Legal Fee Analysis.

For purposes of my analyses in these various cases and my consulting work, we have received and analyzed the time entries, billing rates and expenses billed in many hundreds of cases, involving law firms and law firm offices across the country.[1] I also regularly review cases and articles dealing with attorneys' fees, billing rates and litigation management issues, surveys and articles regarding billing rates being charged in the legal industry and have conducted trainings and taught at seminars where issues relating to attorneys' fees and litigation management issues have been the topic. As a result, I am familiar with typical and commonly accepted billing practices among law firms, as well as the rates typically charged by lawyers of various experience levels and expertise both nationally and in various parts of the United States.

---

[1]We retain the rate information in our records for review in later cases. I receive and review bills and rate information in many cases beyond those I work on as an expert in litigation, including for clients for whom I do consulting work, and I also receive and review compilations of rates from various sources which I consider reliable indicators of rates in various markets.

3/2/16 4:26 PM                                    2

My Resume is attached hereto as Exhibit 1.

Prior testimony and compensation in this action

In the last four years, I have testified at trial or in deposition as follows:

1.    Chiquita Brands International, Inc. v. Federal Insurance Company, et al., Court of Common Pleas, Hamilton County, Ohio, No. A 0808934;

2.    Lockheed Martin Corp. v. RFI Supply, N.D. Cal., No. CV-00-20002

3.    Amundin v. Method 360, Inc., and McKesson Corporation, et al., San Francisco Superior Court, No. CG09486576.

4.    Lionel Sawyer & Collins v. Racusin, AAA Case Number 79-194-Y-00108-08;

5.    Seagate Technologies, LLC v. Fire Insurance Company of Pittsburg, PA, et al., ND Cal. No. CV-09-4120 CW; and

6.    Sheppard Mullin Richter & Hampton LLP v. C.C. Western, Inc., et al., JAMS Arbitration No. 1220041000

7.    Cates v. Chiang, San Diego Superior Court, No. GIC821775)

8.    UnitedHealth Group, Inc. v. Lexington Insurance Company et al., United States District Court, D.Minn, No. 05-CV-01289)

9.    Calvo, Fisher & Jacob LLP v. Lujan, San Francisco Superior Court, No. CGC-10-498299

10.   Nixon Peabody LLP v. Shenkman, San Francisco Superior Court, No. CGC-11-509533

11.   Meyers Law Group, P.C. v. ULTIPRF LLC, JAMS Arbitration No. 1100074315

12.   Select Comfort Corporation v. Arrowood Indemnity Company, District of Minnesota, No. 13-cv-02975-JNE-FLN

13.   Rosen & Associates v. Kurz, JAMS Arbitration Number1220046413

14.   Emulex Corporation et al. v. Marvell Semiconductor, Inc. et al, Santa Clara Superior Court, Case No. 1:13-CV-251215

15.   J.P. Morgan et al. v. Vigilant Insurance Company, et al., Index No. 600979/09

3/2/16 4:26 PM                                3

I am being compensated in this action at the rate of $550 per hour. [2]

Creation of database of time entries

To assist in my analysis in this case, we have created a database of the law firm fees and expenses and have generated various reports from the database to assist me in my analysis.[3] Various of the Exhibits attached to this Report were generated from that database.

Materials reviewed and interviews

In order to undertake my analysis, I reviewed plaintiff's counsels' bills, pleadings in the underlying case, including the Complaint, the Cross-Complaints, the Answer to the Cross-Complaint, the Demurrer to the initial Cross-Complaint, the Ruling on the Demurrer to the initial Cross-Complaint, the Motion for Summary Adjudication, the Motion for Judgment on the Pleadings, the Motion for Complex Designation, the Rulings on the Motions to Compel Discovery and for Complex Designation, as well as the Court of Appeals Order reversing the dismissal of the Complaint. I also reviewed portions of the discovery that was served by the parties and correspondence between representatives of plaintiff and defendant in this action. I also reviewed the Order denying the defendant's Motion to Dismiss and granting the plaintiff's Motion for Summary Judgment in this action.

I also interviewed Trevor Stockinger and Majed Dakak to obtain information about the underlying action.

---

[2] We are also receiving a fixed fee for creation of the database of the time entries described later in the text and the related computer work.

[3] The process for creation of the database of the time and expense entries in this case was as follows:

A.      LCM created an electronic computer file of the time entries in the bills from the law firms. The information put into the computer file typically included the work date, the identity of the biller undertaking each task or group of tasks on the bills, the descriptions of the work undertaken, the time spent, the amount billed, as well as other information from the bills.

B.      We then checked the computer file using various analyses and tests to verify that it accurately reflected the time entries provided. At times, we corrected obvious misspellings or typographical errors.

C.      Once we determined that the information input was accurate, the file was converted into a database "table," and we constructed our database from that table.

Nature of the underlying action

The underlying action involves a dispute between the Association, plaintiff in this action and plaintiff and cross-defendant in the underlying action, and the defendants and cross-complainants in the underlying action. The Association is a homeowners association comprised of the approximately 400 current owners of condominium units located at a residential condominium project on 9th Street in downtown Los Angeles known as Market Lofts. The defendants in the underlying action are affiliated entities which developed Market Lofts condominiums and the parking structure, as well as several individuals who were employees of one of the defendants and served as Board members of the Association immediately after the Association was formed (collectively "defendants" or "9th Street Market"). The dispute involves primarily whether the Association is obligated to pay both past and future monthly parking fees for 319 parking spaces. 9th Street Market contends that the Association and/or its members are obligated to pay the parking fees under a Parking Sub-License and Agreement (the "Sub-License") approved by the Board of the Association while a majority of the Board members were the individual defendants in the underlying action. [4] The Association claims that, for the reasons set forth in the Complaint, the Sub-License is unenforceable and that no monthly parking fees are due or payable from the Association or individual homeowners.

The underlying action was brought by the Association against 9th Street Market, alleging claims for breach of fiduciary duty, fraud, concealment, conspiracy to breach fiduciary duty, unfair business practices, breach of express and implied covenant, and declaratory and injunctive relief. 9th Street Market demurred on the grounds that the Association was not the real party in interest and therefore did not have standing to bring the action. That demurrer was sustained, ultimately without leave to amend, but the Court of Appeal reversed. After the remand, two of the defendants filed a Cross-Complaint against the majority of the individual homeowner members of the Association (which triggered the tender to defendant National Union in this action.) The Association demurred to the Cross-Complaint on the grounds that, among other things, suing the individual homeowners violated the law of the case and public policy relating to the role of Associations in litigation. The Trial Court sustained that demurrer without leave to amend. The defendants and cross-complainants have appealed that decision, which appeal is currently pending. Three of the defendants then filed a second Cross-Complaint against the Association directly, which is currently the operative Cross-Complaint in the underlying action. [5] In response to a motion by the Association, the Trial Court

_____

[4] Unless otherwise indicated, a reference to the "Complaint" will be to the Complaint in the underlying action.

[5] For convenience, the defendants who filed the Cross-Complaints will be referred to at times as the "defendants and cross-complainants.")

designated the underlying action as "complex litigation" under the California Rules of Court. Two mediations have been held, one before, and the other after, the filing of the Cross-Complaint.  Other proceedings in the underlying action will be discussed below.

Overview of fees and expenses at issue

The total billed in this on-going action, as of the time of this Report and since the tender of the initial Cross-Complaint, is $627,699.76, consisting of $621,314.50 in fees and $32,291.71 in expenses.  See Exhibit 2. [6] The Association acknowledges that amounts should be deducted for the retention under the insurance policy, work related to insurance coverage and for work unrelated to the underlying action, which it currently believes totals $8,503.54, and has previously so informed the defendant.  Defendant National Union has so far reimbursed plaintiff $438,029.10, but under a reservation of rights.

Analysis

Reasonableness of the fees and expenses sought to be reimbursed

I have been asked to evaluate the overall legal fees and expenses being sought as damages in this action. Before addressing the factors which relate to the work performed in the case, there are several preliminary observations which are necessary.

First, it is important to note that this litigation is being managed and the bills are being paid by the Association on an ongoing basis.  While the Association has no in-house counsel, the Board of Directors of the Association (the "Board") includes experienced business people who are overseeing the litigation.  Additionally, the Board has formed a litigation committee composed of homeowner members who are lawyers that are in regular communication with the Board and at times with outside counsel in the underlying action regarding how to proceed in the case, and are assisting in carefully managing the case.  The Board has had the bills reviewed and has paid the bills, sometimes with adjustments, understanding that it had no guarantee of reimbursement and thus had every incentive not to pay any amounts that were unreasonable. [7] Under these circumstances, the plaintiff's decision to pay

---

[6] The total amount billed reflects rate discounts agreed to between the Association and law firms.  See Exhibit 2.

[7] This is not a fee-shifting case in which the client has no incentive to manage the case and keep the fees down because the client never will be asked to pay the fees (and often never sees any bills.)  In those types of fee-shifting cases, the time entries are often not reviewed by anyone (other than plaintiff's counsel) until a post-resolution motion for fees where they are presented to the opponent for payment.

3/2/16 4:26 PM                                6

the amounts billed creates a strong presumption that the amounts billed were reasonable.  The management of the case will be discussed further below.

### Analysis of overall reasonableness of fees

In assessing the reasonableness of time and expenses billed, I evaluate various factors in cases to assess whether the overall reasonableness of the fees billed are in the range of reasonableness for the particular case. [8]  With regard to this case, I considered the factors discussed below. [9]

_____

[8] I consider the "range of reasonableness" because there is no one precise amount of fees that is the only correct amount for a particular case.

[9] Many of the factors one considers in assessing the overall reasonableness of fees billed are set out in Rules of Professional Conduct, such as Rule 4-200 of the Rules of Professional Conduct of the State Bar of California.  Rule 4-200 lists the factors to be considered in determining whether fees are to be considered unconscionable:

"(A) A member shall not enter into an agreement for, charge, or collect an illegal or unconscionable fee.
(B) Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events. Among the factors to be considered, where appropriate, in determining the conscionability of a fee are the following:
(1) The amount of the fee in proportion to the value of the services performed.
(2) The relative sophistication of the member and the client.
(3) The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly.
(4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.
(5) The amount involved and the results obtained.
(6) The time limitations imposed by the client or by the circumstances.
(7) The nature and length of the professional relationship with the client.
(8) The experience, reputation, and ability of the member or members performing the services.
(9) Whether the fee is fixed or contingent.
(10) The time and labor required.
(11) The informed consent of the client to the fee."

While the Rule speaks in terms of determining "Unconscionability," the same or similar factors are considered in assessing whether fees are "reasonable" as well, as set out in many cases and the Rules of Professional Conduct of other states as well as the Model Rules of Professional Conduct of the American Bar Association (see Rule 1.5 of the Model Rules.)  Not all the factors are relevant in all cases, and

3/2/16 4:26 PM                                    7

<u>The amount of the fee in proportion to the value of the services</u>

An initial factor to consider is whether the amount of the fees is justified based on the value of the services (or, put another way, do the fees charged appear reasonable given what was at stake or at risk in the litigation.)

The parking fees at issue in this case are very substantial. There are 319 parking spaces, and the Association has paid the fees through the present, amounting to approximately $3,000,000. It is my understanding that the fees accumulate currently at approximately $36,000 per month with escalators such that $71,000,000 would be paid over the next 30 years and $141 million over the next 40 years. Thus, even putting aside any other disputes between the parties as outlined in the Complaint and Cross-Complaint, the amount at issue plainly justifies the expenditure of the fees sought. [10]

<u>Complexities of the underlying action</u>

Another of the factors to consider in assessing the reasonableness of fees being sought is the complexity of the litigation. There is little doubt that the underlying action is a complicated piece of litigation in terms of the amount of activity that has already been generated, is currently going on and that appears likely going forward. In fact, the Trial Court has itself characterized the case as "costly, complicated and oppressive." Memorandum of Point and Authorities in support of Motion for Complex Designation, p. 3:5. [11]

The underlying action involves conflicting claims regarding the interpretation and enforceability of two agreements, the Parking License Agreement and the Sub-License, as well as the impact of the CC&R's for the Association and other documents. So far, the litigation has involved multiple potentially dispositive pre-trial motions, discovery motions, an appeal and decision by the Court of Appeal, and a second appeal which is now pending, multiple sets of written discovery, production of a large volume of documents, and numerous depositions.

Just since the filing of the initial Cross-Complaint, there has been a demurrer, a motion for Judgment on the Pleadings, a Motion for Complex Designation, a motion for summary adjudication, a motion compelling discovery, and multiple formal and

---

other factors may be relevant in other cases. The Rules provide a framework for analyzing fees, but they do not contain all the concerns that can be considered. Essentially, in analyzing legal fees, one is attempting to evaluate all the relevant circumstances of the case.

[10] 9th Market Street has indicated in its Cross-Complaint that it is seeking damages, but they are not specified.

[11] As noted earlier, the Court granted the Motion for Complex Designation.

3/2/16 4:26 PM                                                                8

informal status conferences. Defendant and cross-complaints have noticed 56 depositions to date, and have indicated that they intend to depose the over approximately 500 current and former members of the plaintiff Association. There have been 41 depositions taken so far and depositions are currently proceeding on a schedule of approximately four per week. There have been multiple sets of written discovery by both sides. Over thirty-five thousand pages of documents have been produced so far in this litigation from the parties, as well as third parties. Plaintiff's counsel has spent hundreds of hours collecting and reviewing for production thousands of emails, electronic records and paper records.  So far, the underlying action has involved questions as to the standing of the Association to bring the claims in the Complaint (i.e., whether the Association can bring the action on behalf of itself and its member homeowners) whether, relatedly, the homeowners can be sued individually in a Cross-Complaint, whether certain claims are time-barred because of purported notice to the homeowners and whether the Parking License Agreement should be reformed to reflect what Defendants' claim is their intent to have charged for parking. [12] In addition to the factual and legal issues involved, the litigation has required and will continue to require time communicating with homeowners to update them on the progress of the litigation and defend depositions. In short, the activity and complexities of the underlying case plainly justify the fees billed since the service of the initial Cross-Complaint.

Skill and expertise required

The underlying litigation has required and will continue to require substantial skill and expertise in a number of areas, dealing with both legal and factual issues. The transactions which are at issue in the litigation present complicated questions regarding the interpretation and enforceability of the Parking License Agreement and the Sub-License, as well as other documents, such as the CC&R's, and require specialized real estate knowledge. Not only are there questions of contract interpretation, breach of fiduciary duty and unfair competition, but there has been the preliminary question of standing which led to the initial appeal, as well as whether 9th Street Market can sue the individual members of the Association in a Cross-Complaint which is on a second appeal. The issues of as to the standing and juridical function of homeowners associations requires specialized knowledge. Counsel for both sides have substantial expertise both in litigation and real estate law, and it is required given the nature of the underlying action.

Contentiousness of the litigation

---

[12] The Trial Court ruled on the Association's Demurrer that the individual homeowners could not be sued in a Cross-Complaint.

Defendants and cross-complainants in the underlying litigation have taken an extremely aggressive approach, first challenging the ability of the Association to bring the underlying action, then seeking to name and serve 299 of the individual members of the Association as cross-defendants, and then indicating an intention to depose all current and former homeowners (possibly more than 500 people), with 56 depositions of Association members noticed so far and 34 depositions of homeowners already taken. [13] In addition, I understand that there have been multiple, highly-contentious discovery disputes.  This has caused the judge to implement procedures to streamline resolution of these on-going disputes.  Obviously the more aggressive an opponent's counsel is in litigation, the higher the fees in defending the litigation are going be.  As stated above, the Trial Court has itself noted the contentiousness of the litigation. [14]

<u>Management of the case</u>

How a case is managed is an important consideration in assessing the reasonableness of the fees.  Here, the case was managed carefully at both the client and law firm levels.  At the client level, the Association interviewed several firms before deciding on its initial counsel, terminated its initial counsel when the Board concluded it was not satisfied with the services, hired the current counsel, and hired additional counsel when it appeared necessary given the work load.  The Board negotiated rate discounts from the law firms it retained, has the law firm bills carefully reviewed by its litigation committee and property manager and has obtained write-offs in that process. There are regular communications with the Board about events and strategy in the case and how the case should be handled.  In short, the Association is managing the case as would a sophisticated business client trying to manage a case in a cost-effective manner.

At the law firm level, the case is also being managed carefully.  I understand that the client and the law firms have worked to avoid unnecessary duplication of work. [15] Steps have been taken to avoid unnecessary duplication, <u>e.g.</u>, a spreadsheet

---

[13] In addition, the Association has taken six depositions.

[14] Litigation strategy sometimes involves making litigation expensive, time-consuming and inconvenient for the other side; and, based on the approach taken in this case, it appears that 9th Street Market's strategy in this case will have a major impact on the fees that the Association will be required to spend.

[15] Swedelson Gottlieb ("Swedelson") acts to some degree as the Association's general counsel.  They have provided some services in the litigation where their experience and expertise makes it more efficient, but Freeman Freeman & Smiley ("Freeman") and Kesselman Brantly and Stockinger ("Kesselman") have been the two firms handling most aspects of the litigation.  After the first law firm hired by the Association was terminated, Freeman was retained, followed by Kesselman after

3/2/16 4:26 PM    10

is maintained of each project and the billers undertaking the work to avoid multiple billers unnecessarily involved in projects. [16] As discussed above, defendants and cross-complainants have noticed 56 depositions so far and 34 homeowner depositions have been taken, and, to remove the need for multiple lawyers to get up to speed, the homeowner depositions are primarily the responsibility of only two lawyers who are handling them whenever possible. The firms carefully review their bills before sending them to the Association and write off time before it is billed. The firms regularly report to the Board about the case and discusses strategy and how to cost-effectively approach the litigation.

In short, particularly given what is at stake in the case and the aggressive approach of the defendants and cross-complainants, the case appears to be managed carefully and extremely well by both the Association and law firms.

<u>Summary re reasonableness of time and fees</u>

In summary, the underlying litigation is a complex case, with a tremendous amount at stake for both sides of the litigation. It is being aggressively pursued by the defendants and cross-complainants, but still being carefully managed by the Association and its law firms. Based on all the foregoing, in my opinion, the time and fees billed by the Association's counsel are reasonable.

<u>Areas identified by defendant as not related to defense of the Cross-Complaints</u>

There were certain tasks in the bills which coverage counsel for the defendant identified as not being reasonably related to defense of the Cross-Complaints, but instead only related to the plaintiff's affirmative claims. The Association has identified certain entries in the bills that it acknowledges relate to this action or are not related to either the underlying action or this action. In both situations, the fees billed in those entries is not being sought, and plaintiff has so notified the defendant. However, as to other entries identified by coverage counsel for the defendant as not relating to defense of the Cross-Complaint, because of the nature of the plaintiff's affirmative claims, proving those claims would be instrumental in defeating the Cross-Complaints. [17] Under those circumstances, it

---

the initial Cross-Complaint was filed. A summary of the each biller's time and fees is attached hereto as Exhibit <u>3</u>.

[16] The fact that multiple billers (or multiple firms) may be involved in projects is not necessarily unreasonable. It is common and often necessary for multiple billers and multiple firms to be involved in particular projects. The problem is with <u>unnecessary</u> duplication, which is what the law firm took steps to avoid.

[17] As just one example of the inter-related nature of the Complaint and Cross-Complaints, evidence supporting the Association's claims for fraud and breach of

3/2/16 4:26 PM                                    11

would appear that work related to the affirmative claims would be reasonably related to defense of the Cross-Complaints. [18]

Areas of adjustments

Although in my opinion the time and fees being sought are within the range of reasonableness for the work undertaken so far and that needed to be undertaken in defense of the Cross-Complaints, there were time entries that I identified in my review of the bills that I have advised counsel for the Association that, in order to be conservative, I would deduct from the fees being sought. They are identified on Exhibit 4 hereto.

Summary

The foregoing reflects my analysis, opinions and conclusions to date, and based on the foregoing, in my opinion, the fees and expenses being sought for reimbursement are reasonable and appropriate.

I reserve the right to supplement this Report and my opinions relating to the issues addressed herein before trial, as additional documents, information, and/or testimony relating to these issues come to my attention.

Dated: March 2, 2016                            _____

                                                Gary Greenfield

---

fiduciary duty would appear directly relevant to the defenses of estoppel and unclean hands in the Association's Answer to the Cross-Complaint.
[18] My conclusions regarding what may be defense-related are based on my experience as a litigator and my review of the record that I have been able to undertake so far. However, I am not an expert in insurance coverage so I am not stating my opinion as to what is covered or not covered.

3/2/16 4:26 PM                          12                          3064295 v.1

Litigation Cost Management    **List of Exhibits**    Market Lofts

| | |
|---|---|
| 1 | Resume of Gary Greenfield |
| 2 | Amounts Billed |
| 3 | Biller Summary |
| 4 | Additional Entries to Withdraw |

# EXHIBIT "1"

## RESUME

## GARY GREENFIELD

## PROFESSIONAL EXPERIENCE

### LITIGATION COST MANAGEMENT

**January 1, 1991 to date**--Founder of Litigation Cost Management, a consulting firm which specializes in legal and expert fee analysis and consulting with clients respecting improving the management of their litigation.

#### Special Master

Appointed Special Master by San Francisco Superior Court to analyze fees and expenses of lawyers and expert witnesses

#### Expert consultant/witness

Qualified and testified in numerous court proceedings and arbitrations regarding attorneys' fees issues

#### Litigation management/auditing training and consulting

Consulting and training for both clients and law firms in litigation management and cost control and legal bill auditing and analysis

### OTHER LEGAL EXPERIENCE

**October 1, 1975 to December 31, 1990**--Litigator in San Francisco law firm of Shartsis, Friese & Ginsburg. Handled complex litigation of various types, covering all stages of cases including trials in state and federal courts. Became partner on January 1, 1981.

### EDUCATION

**University of California at Berkeley (Boalt Hall)**--J.D., 1975. Member, California Law Review. Order of the Coif.

**Stanford University**--B.A., 1971. Phi Beta Kappa. Degree with Distinction.

**RESUME** (Page 2)

**ARTICLES**

"An Auditor Speaks to Law Firms," The Recorder,  August 16, 1991

"Audits Often Signal a Management Failure,"  Illinois Legal Times, September, 1991

"Five Early Warning Signs of Potential Overbilling," The Recorder, October 24, 1991

"Estimating the Cost of a Case,"  Corporate Legal Times, January, 1992

"Litigation Management:  It's All in the Mind,"  Committee on Corporate Counsel Newsletter (ABA Section of Litigation), February, 1992

"Keep High Litigation Costs Off Your Case,"  Public Risk, February, 1992

"How One Company Uses In-House Audits," Corporate Legal Times, June, 1992

"Litigation Management:  What Law School Never Taught You," California Lawyer, July, 1992

"Harnessing the Cost of Legal Bills,"  Risk Management, January, 1993

"Strategies for Reducing Your Legal Bills," Small Business Reports, June, 1993

"Efficient Litigation: An Ethical Imperative?"  The American Lawyer, April, 1994

"Fee Fight (Using A Legal Fee Auditor in Billing Disputes)," Los Angeles/San Francisco Daily Journal, February 28, 1997

"Legal Bill Auditing–Problems and Perspectives," Law Governance Review, Autumn, 1997

90

**RESUME** (Page 3)

## SEMINARS AND WORKSHOPS CONDUCTED

**American Management Association**--Two-day seminars in effective litigation management

**Western Bankers' Association**--Multiple workshops across California on effective litigation management

**Continuing Professional Education, Inc.**--Seminars in legal bill auditing and litigation management for financial professionals

## OTHER SPEAKING ENGAGEMENTS

National Association of Legal Fee Analysis (NALFA)

ABA National Litigation Institute ("Applying TQM in Litigation")

Practising Law Institute ("Litigation Management Supercourse")

Los Angeles County Bar Association ("All About Fees")

National Association of Government Guaranteed Lenders

California Redevelopment Association

Public Risk Management Association

91

# EXHIBIT "2"

Litigation Cost Management | **Amounts Billed** | <u>Market Lofts</u>

| Firm | Invoice Number | Invoice Date | Fees | | Discounts | | Expenses | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Freeman | 324748 | 12/22/14 | $ | 3,984.00 | $ | (597.60) | $ | 204.00 | $ | 3,590.40 |
| Freeman | 325318 | 1/12/15 | $ | 6,327.00 | $ | (949.05) | $ | 143.64 | $ | 5,521.59 |
| Freeman | 325319 | 1/12/15 | $ | - | $ | - | $ | 3,347.50 | $ | 3,347.50 |
| Freeman | 327400 | 2/20/15 | $ | 12,350.00 | $ | (1,852.50) | $ | 61.20 | $ | 10,558.70 |
| Freeman | 329294 | 3/31/15 | $ | 12,017.50 | $ | (1,802.63) | $ | 136.25 | $ | 10,351.12 |
| Freeman | 330628 | 4/22/15 | $ | 3,349.50 | $ | (502.43) | $ | 92.74 | $ | 2,939.81 |
| Freeman | 332127 | 5/21/15 | $ | 8,074.50 | $ | (1,211.18) | $ | 221.25 | $ | 7,084.57 |
| Freeman | 333778 | 6/29/15 | $ | 9,853.50 | $ | (1,478.03) | $ | 454.66 | $ | 8,830.13 |
| Freeman | 336901 | 8/28/15 | $ | 4,938.00 | $ | (740.70) | $ | 60.12 | $ | 4,257.42 |
| Freeman | 339687 | 10/22/15 | $ | 14,988.00 | $ | (2,248.20) | $ | 144.29 | $ | 12,884.09 |
| Freeman | 339879 | 10/30/15 | $ | 8,334.50 | $ | (1,250.18) | $ | 209.91 | $ | 7,294.23 |
| Freeman | 341063 | 11/20/15 | $ | 24,324.00 | $ | (3,648.60) | $ | 409.88 | $ | 21,085.28 |
| Freeman | 343321 | 1/11/16 | $ | 19,246.00 | $ | (2,886.90) | $ | 2,537.96 | $ | 18,897.06 |
| Freeman | 344142 | 1/26/16 | $ | 44,923.00 | $ | (6,738.45) | $ | 2,440.75 | $ | 40,625.30 |
| Kesselman | 20041 | 12/1/14 | $ | 4,155.25 | $ | - | $ | 1.47 | $ | 4,156.72 |
| Kesselman | 20057 | 1/9/15 | $ | 6,583.75 | $ | - | $ | 124.09 | $ | 6,707.84 |
| Kesselman | 20077 | 2/4/15 | $ | 7,814.00 | $ | - | $ | - | $ | 7,814.00 |
| Kesselman | 20093 | 3/6/15 | $ | 6,227.50 | $ | - | $ | 3.50 | $ | 6,231.00 |
| Kesselman | 20112 | 4/7/15 | $ | 27,500.00 | $ | - | $ | - | $ | 27,500.00 |
| Kesselman | 20135 | 5/15/15 | $ | 19,466.50 | $ | - | $ | - | $ | 19,466.50 |
| Kesselman | 20175 | 6/5/15 | $ | 20,127.50 | $ | - | $ | 24.01 | $ | 20,151.51 |
| Kesselman | 20193 | 7/8/15 | $ | 20,461.50 | $ | - | $ | 207.31 | $ | 20,668.81 |
| Kesselman | 20215 | 8/7/15 | $ | 20,492.00 | $ | - | $ | 12.10 | $ | 20,504.10 |
| Kesselman | 20236 | 9/15/15 | $ | 31,090.00 | $ | - | $ | 374.44 | $ | 31,464.44 |
| Kesselman | 20263 | 10/21/15 | $ | 21,041.50 | $ | - | $ | 67.45 | $ | 21,108.95 |
| Kesselman | 20285 | 11/12/15 | $ | 99,272.50 | $ | - | $ | 97.48 | $ | 99,369.98 |
| Kesselman | 20303 | 12/18/15 | $ | 67,004.50 | $ | - | $ | 10,270.76 | $ | 77,275.26 |
| Kesselman | 20323 | 1/13/16 | $ | 87,029.50 | $ | - | $ | 10,584.11 | $ | 97,613.61 |
| Swedelson | 13100 | 11/6/14 | $ | 1,708.50 | $ | - | $ | 30.15 | $ | 1,738.65 |
| Swedelson | 13725 | 1/7/15 | $ | 2,043.50 | $ | - | $ | 19.40 | $ | 2,062.90 |
| Swedelson | 14029 | 2/5/15 | $ | 2,613.00 | $ | - | $ | - | $ | 2,613.00 |
| Swedelson | 14349 | 3/5/15 | $ | 335.00 | $ | - | $ | - | $ | 335.00 |
| Swedelson | 14683 | 4/7/15 | $ | 770.50 | $ | - | $ | - | $ | 770.50 |
| Swedelson | 15039 | 5/8/15 | $ | 405.00 | $ | - | $ | 10.80 | $ | 415.80 |
| Swedelson | 15725 | 7/7/15 | $ | 1,257.50 | $ | - | $ | 0.49 | $ | 1,257.99 |
| Swedelson | 17367 | 11/6/15 | $ | 1,206.00 | $ | - | $ | - | $ | 1,206.00 |
| **Total** | | | $ | **621,314.50** | $ | **(25,906.45)** | $ | **32,291.71** | $ | **627,699.76** |

# EXHIBIT "3"

Litigation Cost Management | **Biller Summary**<br>**Sorted by Hours** | Market Lofts

| Biller | Firm | Rate | Hours | Percent | Cumulative | Fees | Percent | Cumulative |
|--------|------|------|-------|---------|------------|------|---------|------------|
| Trevor Stockinger | KBS | 325 | 575.45 | 29% | 29% | $ 187,021.25 | 30% | 30% |
| Todd Lander | FFS | 395 | 273.50 | 14% | 43% | $ 108,032.50 | 17% | 47% |
| Majed Dakak | KBS | 325 | 249.85 | 13% | 56% | $ 81,201.25 | 13% | 61% |
| Kara McDonald | KBS | 275 | 215.90 | 11% | 67% | $ 59,372.50 | 10% | 70% |
| Koral Fusselman | KBS | 275 | 99.50 | 5% | 72% | $ 27,362.50 | 4% | 75% |
| Augie Porras | KBS | 190 | 95.60 | 5% | 76% | $ 18,164.00 | 3% | 77% |
| Amy Brantly | KBS | 325 | 76.00 | 4% | 80% | $ 24,700.00 | 4% | 81% |
| Robert Crowder | FFS | 404 | 70.00 | 4% | 84% | $ 28,289.00 | 5% | 86% |
| Krystle Meyer | KBS | 275 | 63.80 | 3% | 87% | $ 17,545.00 | 3% | 89% |
| Joyce Ma | FFS | 300 | 57.40 | 3% | 90% | $ 17,220.00 | 3% | 92% |
| David Drexler | KBS | 190 | 55.00 | 3% | 93% | $ 10,450.00 | 2% | 93% |
| Julie Lombard | KBS | 190 | 48.00 | 2% | 95% | $ 9,120.00 | 1% | 95% |
| Tracy Daub | FFS | 364 | 40.00 | 2% | 97% | $ 14,562.50 | 2% | 97% |
| Alexander Noland | SG | 335 | 21.50 | 1% | 98% | $ 7,202.50 | 1% | 98% |
| Joanna Maxwell | FFS | 415 | 9.00 | 0% | 99% | $ 3,735.00 | 1% | 99% |
| David Kesselman | KBS | 325 | 8.90 | 0% | 99% | $ 2,892.50 | 0% | 99% |
| Joan Lewis-Heard | SG | 335 | 6.60 | 0% | 100% | $ 2,211.00 | 0% | 100% |
| Chris Avery | FFS | 120 | 2.70 | 0% | 100% | $ 324.00 | 0% | 100% |
| Melinda Quiane | KBS | 190 | 2.30 | 0% | 100% | $ 437.00 | 0% | 100% |
| Moorisha Bey-Taylor | FFS | 240 | 1.65 | 0% | 100% | $ 396.00 | 0% | 100% |
| David Swedelson | SG | 350 | 1.40 | 0% | 100% | $ 490.00 | 0% | 100% |
| Brian Moreno | SG | 335 | 1.00 | 0% | 100% | $ 335.00 | 0% | 100% |
| Arash Beral | FFS | 376 | 0.40 | 0% | 100% | $ 150.50 | 0% | 100% |
| Alyssa Klausner | SG | 335 | 0.30 | 0% | 100% | $ 100.50 | 0% | 100% |
| **Total** | | 314 | 1,975.75 | 100% | 100% | $ 621,314.50 | 100% | 100% |

Report Date: 3/2/16, 12:04 PM

Page 1 of 1

95

# EXHIBIT "4"

| **Additional Entries to Withdraw** |

| Date | Biller | Firm | Description | Hours | Rates | Fees | ID |
|------|--------|------|-------------|-------|-------|------|-----|
| 11/13/14 | Quiane, M. | KBS | Draft NOA, print out and give to MD | 0.75 | 190 | $143 | 6 |
| 11/14/14 | Quiane, M. | KBS | revise Ntc of Assn; draft/send email to co-counsel of same for review | 0.50 | 190 | $95 | 8 |
| 2/13/15 | Quiane, M. | KBS | Scan discovery responses/email to team/upload to box | 0.70 | 190 | $133 | 103 |
| 2/16/15 | Porras, A. | KBS | Accept invite to Market Lofts on Box from Majed. Invite two people at Majed's request to view Defendant ROG Responses and Defendant RFP Responses. Download and print the Defendant RFP and ROGs for Majed. | 0.50 | 190 | $95 | 104 |
| 2/19/15 | Porras, A. | KBS | Scan Defendant responses to RFP Set One, and email to Todd Lander, per Majed's request. Resize the PDFs so they can be emailed, then resend the email. | 1.00 | 190 | $190 | 114 |
| 2/25/15 | Porras, A. | KBS | Send Box invite to Tracy per Majed's request. Email back to Tracy and Majed that the invites were sent. | 0.30 | 190 | $57 | 118 |
| 3/6/15 | Dakak, M. | KBS | Review voice messages form Mr. Lander. | 0.10 | 325 | $33 | 123 |
| 3/10/15 | Dakak, M. | KBS | Call and leave a voice message to Mr. Lander re discovery. | 0.10 | 325 | $33 | 146 |
| 4/8/15 | Porras, A. | KBS | Download pleading from box and OCR in order to pull cites. | 0.30 | 190 | $57 | 249 |
| 4/28/15 | Porras, A. | KBS | Send Box invite to Paulette to view Def Rog and RFP responses, send email directly to Paulette and CC Majed. | 0.50 | 190 | $95 | 290 |
| 6/5/15 | Meyer, K. | KBS | Prepare change of address | 0.20 | 275 | $55 | 399 |
| 7/9/15 | Dakak, M. | KBS | Email to Ms. Young re court reporting for status conference. | 0.10 | 325 | $33 | 482 |
| 7/10/15 | Dakak, M. | KBS | Draft correspondence between myself and Mr. Declark re court reporter for status conference. | 0.10 | 325 | $33 | 488 |
| | Dakak, M. | KBS | Research procedure re court reporter for status conference. | 0.10 | 325 | $33 | 489 |
| 9/9/15 | Dakak, M. | KBS | Coordinate with Mr. Korman and Mr. Marks re court reporter for upcoming hearing. | 0.10 | 325 | $33 | 661 |
| 10/6/15 | Porras, A. | KBS | Create database manuals for team to use. | 1.00 | 190 | $190 | 750 |
| 10/8/15 | Beral, A. | FFS | REVIEW VOICEMAIL FROM PANSKY MARKLE FIRM AND EMAIL TO TEAM RE SAME. | 0.10 | 385 | $39 | 2199 |
| 10/14/15 | Porras, A. | KBS | Consult with Chris at FFS for doing advanced searches in database. | 1.00 | 190 | $190 | 795 |
| 10/16/15 | Porras, A. | KBS | Connect to Market Lofts database for temp, and install plugins for document review. | 1.50 | 190 | $285 | 807 |

Report Date: 3/2/16 1:49:14 PM

Case 2:15-cv-03093-RGK-SP    Document 64-4    Filed 04/15/16    ID #:4626

98

**Litigation Cost Management**                 **Additional Entries to Withdraw**                    **Market Lofts**

| Date | Biller | Firm | Description | Hours | Rates | Fees | ID |
|------|--------|------|-------------|-------|-------|------|-----|
| 10/20/15 | Porras, A. | KBS | Correspond with Chris Avery re browser to use for Market Lofts database. | 0.25 | 190 | $48 | 825 |

**Report Totals**

| | |
|---|---|
| Hours | 9.20 |
| Avg. Rates | 202.77 |
| Fees | $1,865.50 |
| Number of Entries | 20 |
| Number of Billers | 5 |

Report Date: 3/2/16 1:49:15 PM